FY2014     9/18/2013

## CHESTERFIELD COUNTY, VIRGINIA
## CASH PROFFER POLICY

A.  General Guidelines

1.  The Board will accept cash proffers for rezoning requests that permit residential uses in accordance with this policy. However, the Board may also accept cash, land or in-kind improvements for the capital facilities included in the County's cash proffer calculation in accordance with county and state law. Land or in-kind improvements may be accepted in addition to or in lieu of cash payments. The Board will consider providing a credit for dedications of land and in-kind improvements, such credit being applied to the specific capital facility category for which the dedication or in-kind improvement is proffered. In its review of zoning requests, the Board will consider health, safety and welfare issues and measures taken by the zoning applicants to address their impacts on capital facilities in accordance with this policy. An application containing proffers that satisfactorily mitigate the impact on capital facilities does not necessarily satisfy all health, safety and welfare issues.

2.  Pursuant to this policy, staff will (i) calculate the annual net cost of public facilities, (ii) calculate the fiscal impact of a rezoning request that permits residential uses and (iii) administer the collection and expenditure of proffered funds. Transportation proffers for non-residential rezonings shall be computed by the Transportation Department on the same basis utilized prior to July, 1989, and at the Board's option, may include cash instead of improvements.

3.  Any cash proffer policy must meet a "reasonableness" or "rough proportionality" test, which requires the Board to determine in each zoning case whether the amount proffered is related both in nature and extent to the projected impact of the proposed development on public facilities. Through this policy, staff will be able to recommend a maximum proffer in each case that meets this test of reasonableness.

4.  Staff determines the cost of public facilities generated by new growth by relying on the assumption that any revenue derived from growth (residential and commercial real estate taxes, sales taxes, fees, etc.) will pay all the normal operating costs for services to residents of new developments with no funds remaining to pay for the cost of public facilities needed to serve these residents. State and county laws permit the Board to accept cash proffers to fund the public facility needs generated by any new residential development.

5.  In determining the net cost per dwelling unit of a public facility, staff relies on countywide averages, where possible. In addition, staff will consider the five components described below, as well as any other unique circumstances of which staff is aware, related to an individual zoning case.

FY2014    9/18/2013

6. To determine how and where a proffer will be spent, the County is divided into geographic or service districts. For facilities which have a Countywide service district (parks, libraries, and fire stations), the proffer may be spent Countywide. For roads and schools, the proffer will be spent within smaller service districts as described below.

7. The following public facilities will be funded by cash proffers: schools, roads, parks, libraries, and fire stations. The County does not currently accept cash proffers to fund public facilities such as jails, landfills and other government facilities.

8. A development proposal's impact on capital facilities will be evaluated based on the gross number of proposed dwelling units. When calculating the gross number of dwelling units, staff will:

    a. use the lesser of average actual recorded lot yields and the number of dwelling units proffered by the applicant and,

    b. not give credits for those dwelling units permitted under existing conditions of zoning or agricultural lots, and will not consider the transferring of allowable units from other properties.

    The Board may consider development proposals that include substantial upgrades to current design/development standards and ordinance requirements as justification for accepting reduced cash proffer payments for the pre-existing lot yields provided the applicant has not otherwise submitted documentation indicating higher lot yields in conformance with existing ordinances and reflective of site-specific physical features.

9. A development proposal's fiscal impact on capital facilities shall be established under the Board of Supervisors' cash proffer policy that is in effect at the time the case is being heard; however, if the Board of Supervisors changes the maximum cash proffer amount while the development proposal is still pending, the revised maximum cash proffer amount shall be applied. A pending development proposal shall be subjected to only one revision in the maximum cash proffer amount, such revision being the first revision following the application date, provided the case is approved within two years of the application date, excluding any time the case was deferred at the Board's request, but a development proposal not decided within this time frame will be evaluated in accordance with the maximum cash proffer in place at the time the case is heard.

FY2014    9/18/2013

B.  Methodology and Policy Terms

1. There are five "components" involved in calculating what a new dwelling unit will cost the County in terms of providing public facilities. The components are as follows:

    a. Demand generators - Staff uses the weighted average of single family and multi-family persons per household (2.72 for FY06) and an average number of students per household (0.53 for FY06) to calculate demand generators (number of people and number of students) associated with a new dwelling unit.

    b. Service levels - Staff calculates existing service levels for each type of facility for which a cash proffer will be accepted. Examples of service levels are: 5.53 acres of park land per 1,000 people, 2.34 library books per person, and 99 square feet of space per elementary school child. (Service levels are calculated annually)

    c. Gross cost of public facilities – Staff calculates the gross cost of public facilities. The gross cost is used because a credit (described in (d) below) for anticipated future revenues from a new dwelling unit will be applied against the gross cost. For example, to calculate the gross cost of park facilities, multiply the average persons per dwelling unit by the cost per acre of park land plus improvement cost per acre of park land times the acres per capita.

    d. Credits – Staff calculates a credit to apply against the gross cost for each public facility. Chesterfield has issued and plans to continue to issue general obligation bonds to finance the construction of public facilities. Residents of new developments will pay real estate taxes to the County and a portion of these taxes will go to help retire this debt. So that new dwelling units are not paying twice (once through payment of a cash proffer and again through real estate taxes) a credit is computed.

    e. Net cost – Staff calculates the net cost per public facility or maximum cash proffer. This is the gross cost [(B)(1)(c)] per public facility minus the applicable credit [(B)(1)(d)] per public facility.

2. There must be a relationship between the rezoning itself and the need for a public facility. In order to ensure that money proffered by an applicant is used to fund the public facilities necessitated by the development, geographic service areas or districts are established across the County.

    a. Since parks, libraries, and fire stations serve the entire County, the geographic service districts for these facilities are determined to be countywide. Rezoning requests can be analyzed on a countywide basis to determine their impact on these facilities and proffers may be spent to fund these facilities countywide.

Case 3:14-cv-00589-MHL   Document 14-1   Filed 09/29/14   Page 4 of 6 PageID# 251

b. Rezoning requests can be analyzed on a countywide basis to determine their impact on schools. In order to ensure that money proffered by an applicant is used to fund the public facilities necessitated by the development, the county is divided into three geographic service districts corresponding to the attendance zones of grouped high schools. District one corresponds to the combined attendance zones for James River, Midlothian and Monacan High Schools, District two corresponds to the combined attendance zones for Clover Hill, Cosby, Manchester and Matoaca High Schools and District three corresponds to the combined attendance zones for Meadowbrook, Bird and Thomas Dale High Schools. Funds collected from a development within a District will be spent on school improvements within that District or for any school improvement that provides relief for the District the development is in.

c. With respect to roads, rezoning requests are analyzed based on two geographic service districts, one north of Route 360 and one south of Route 360, to determine costs and impact. These service districts are used to calculate a road cost per dwelling unit. The Transportation Department has identified 19 traffic sheds across the County and money collected from a development within a particular shed will be spent on road improvements within that shed or on roads that provide relief to that shed.

3. The Board may prefer that a rezoning applicant mitigate the development's calculated impact on public facilities by dedicating property or doing in-kind improvements in lieu of all or a portion of the cash proffer. For property designated for dedication (excluding roads) staff will follow the County's procedure for "Acquisition of Private Property for Public Use". The value of donated land generally will be based on the current assessed value of the property, not to exceed the cost per acre used in the calculation of the proffer. The value of improvements shall be the estimated cost as determined by the County and calculated as if constructed by a governmental entity. If the dedication or in-kind improvement does not fully mitigate the development's calculated impact on public facilities, then the dedication and/or improvement's value may be applied as a credit against the development's calculated impact on the applicable public facility. The credit cannot exceed the development's calculated impact on the applicable public facility. If the value of the dedication or improvement is more than the calculated impact for the applicable public facility, the County may pay the difference. Credit for roads may be allowed for off-site land dedication or improvements, as recommended by the Transportation Department.

4. The County will continue to consider any unique circumstances about a proposed development that: (i) mitigate the development's projected impact on public facilities; and (ii) create a demonstrable reduction in capital facility needs. Unique circumstances may include, but not be limited to, participation in regional road projects and age-restricted housing projects. The County, the zoning applicant or any other person may identify such mitigating circumstances.

4

FY2014    9/18/2013

5. The County will consider unique circumstances for revitalization projects when a) the development proposal is on property in the county's enterprise zone or areas in the county that are determined to be blighted and b) when the development proposal includes commercial uses in addition to housing unless incompatible with the Comprehensive Plan. If warranted, the County may consider a reduction to an applicant's cash proffer for such revitalization projects that provide an economic benefit to the County.

6. When a rezoning application is filed to modify a development proposal that contains cash proffers and was approved within the previous five years, then the county may determine that the rezoning application constitutes only a minor modification and that the previously accepted cash proffer amount adequately addresses the capital impacts of the modified development proposal.

7. Notwithstanding the provisions of any proffer for a dwelling unit calculated on a per unit basis and accepted in any zoning case, the County will accept the cash proffer payment on such unit after final inspection but before issuance of a certificate of occupancy, whether temporary or final. Other proffered cash contributions, the payment of which is tied in the proffer to a particular time or event, shall continue to be payable in accordance with the terms of the proffer. Timing for dedication of property or in-kind improvements should be specified in the proffer. Cash proffers, property dedications and in-kind improvements must be used for projects identified in the Capital Improvement Program. The Capital Improvement Program is based in part on the County's Public Facilities Plan, which projects long-term facility needs. Under no circumstances shall the County issue a certificate of occupancy for such dwelling unit until the cash proffer for the unit has been paid in full to the County.

8. Cash proffer payments shall be used to fund schools, roads, parks, libraries and fire station capital facilities. Payments shall be expended in accordance with state law.

9. Adjustments in the cash proffer amount may be considered every fiscal year. Staff will recompute net costs based on the current methodology and recommend adjustments. Any adjustments to the maximum cash proffer amount would be effective upon adoption, but no sooner than July 1 of the new fiscal year.

10. The Board of Supervisors has established $18,966 as the maximum per dwelling unit cash proffer that it will accept in a zoning case. The Board has also established that, absent other Board action, approved per dwelling unit cash proffer amounts shall be fixed for a period of four years beginning on July 1 of the fiscal year in which a case is approved. Thereafter, cash proffer amounts shall be automatically adjusted, annually, by the annual change in the Marshall and Swift Building Cost Index on July 1 of each year, subject to paragraph 11, below.

FY2014    9/18/2013

11. The amount of the first adjustment for the per dwelling unit cash proffer for approved cases, absent any other Board action, shall be an amount equal to the per dwelling unit cash proffer amount approved with the case adjusted for the four year cumulative change in the Marshall and Swift Building Cost Index between July 1 of the year in which the case was approved and July 1 four years later. Thereafter, the per dwelling unit cash proffer amount shall be automatically adjusted, annually, by the annual change in the Marshall and Swift Building Cost Index on July 1 of each year.

Revised: <u>September 18, 2013</u>
Effective: <u>September 18, 2013</u>