CASE MANAGER: Robert Clay





BS Time Remaining:
365 days

~~November 15, 2012 CPC~~
~~February 19, 2013 CPC~~
~~May 21, 2013 CPC~~
~~August 20, 2013 CPC~~
~~November 19, 2013 CPC~~
~~January 21, 2014 CPC~~
~~January 23, 2014 CPC~~
~~February 18, 2014 CPC~~
~~March 12, 2014 BS~~
July 23, 2014 BS

STAFF'S
REQUEST ANALYSIS
AND
RECOMMENDATION

13SN0125

Viridis Development Corporation

Clover Hill Magisterial District
Reams Road Elementary; Providence Middle and Monacan High School Attendance Zones
Off the northern terminus of Vickilee Road

REQUESTS:  I.  Amendment of zoning (Case 06SN0127) to eliminate Cash Proffers (Proffered Condition 2). In lieu of a cash proffer, the applicant has offered an "in-kind" transportation improvement (Proffered Condition 2), and;

II. Amendment of zoning (Case 06SN0127) to increase density for development having sole access through Forest Acres Subdivision. (Proffered Condition 8).

PROPOSED LAND USE:

A single-family residential subdivision with a minimum lot size of 12,000 square feet is planned.

PLANNING COMMISSION RECOMMENDATION

RECOMMEND APPROVAL AND ACCEPTANCE OF THE PROFFERED CONDITIONS ON PAGE 2.

AYES: MESSRS. WALLIN, PATTON, GULLEY AND WALLER.
NAY: DR. BROWN.

STAFF RECOMMENDATION

Recommend denial of the request to eliminate the cash proffer (Request I) and approval of the request to increase density (Request II), for the following reasons:

> While the proposed density complies with the Northern Courthouse Road Community Plan and is compatible with area development, and the "in-kind" improvements address the impact on transportation facilities, the application does not mitigate the impacts of this development on school, park, library and fire station facilities, thereby not ensuring adequate service levels are maintained and protecting the health, safety and welfare of County citizens.

(NOTE: THE ONLY CONDITION THAT MAY BE IMPOSED IS A BUFFER CONDITION. THE PROPERTY OWNER(S) MAY PROFFER OTHER CONDITIONS. CONDITIONS NOTED "CPC" ARE CONDITIONS RECOMMENDED BY THE COMMISSION.)

PROFFERED CONDITION

(CPC)   1.   Any residential lots having sole access through Forest Acres Subdivision shall have an average lot size of 17,400 square feet. There shall be no more than 50 lots if sole access is provided through Forest Acres Subdivision. (P)

(Note: This proffered condition replaces Proffered Condition 8 of Case 06SN0127.)

(CPC)   2.   In conjunction with development of the initial section, the Developer shall construct a northbound right turn lane along Courthouse Road at Cherylann Road. The exact design of this improvement shall be approved by the Transportation Department. The developer shall be responsible for dedication to Chesterfield County, free and unrestricted, of any additional right-of-way (or easements) required for this improvement. In the event the Developer is unable to acquire any "off-site" right-of-way that is necessary for this improvement, the Developer may request, in writing, that the County acquire such right-of-way as a public road improvement. All costs associated with the acquisition of the right-of-way shall be borne by the Developer. (T)

(Note: This proffered condition is in addition to Proffered Conditions of Case 06SN0127. In addition, should this request be approved, Proffered Condition 2 of Case 06SN0127 (Cash Proffer) would be deleted. All other conditions of approval for Case 06SN0127 would remain in effect.)

## GENERAL INFORMATION

Location:

The request property is located off the northern terminus of Vickilee Road, the western terminus of Marblethorpe Road, north of Cherylann Road and the eastern terminus of North Vickilee Road and Vickilee Court. Tax IDs 746-699-8830; and 747-699-0744, 1248, 1750, 2453, 3040 and 4454.

Existing Zoning:

R-12

Size:

22.6 acres

Existing Land Use:

Vacant

Adjacent Zoning and Land Use:

North and South – R-7; Single-family residential or vacant
East – R-9 and A; Single-family residential
West – R-9; Single-family residential

## UTILITIES

Public Water System:

The public water system is directly available to this site. There is an eight (8) inch water line extending to the northwest corner of the request site. There is also a six (6) inch water line extending along Marblethorpe Road to the eastern property boundary and to the northeastern corner of the request site. Connection to the public water system is required with Case 06SN0127.

Public Wastewater System:

The public wastewater system is available to the request site. There is an eight (8) inch wastewater line extending along the northern property boundary of the request site. There is also an eight (8) inch wastewater line extending along the southern property boundary of the request site. Connection to the public wastewater system is required with Case 06SN0127.

## ENVIRONMENTAL

Drainage and Erosion:

The subject property drains in three (3) directions. A small portion of the property drains to the southwest to Heather Ridge, Section 4. There are currently easements available which could be utilized for improvements, if necessary. Possibly, twenty-five (25) percent of the property drains in this direction. The remaining property drains to the south into Forest Acres, Section 2.

There are many off-site drainage problems for that portion of the property that drains to the south into Forest Acres. Forest Acres subdivision, recorded in 1959, was developed prior to the County's enforcement of stormwater regulations and therefore does not possess adequate storm drainage conveyance systems to accommodate the increased runoff generated by the development of this site.

As a result, the applicant in the original zoning in 2006 proffered a study to determine what downstream improvements in Forest Acres would be required to achieve required standards and floodplain protection. The construction plans would then have to reflect the improvements which must be installed in the first phase of construction. The approved construction plans protect the homes from flooding on a 100 year storm but the design has little or no margin for additional impervious area that would result from approval of this case to drain through Forest Acres to the south. While the approved construction plans include portions of the two (2) lots that extend into the subject property (reference Attachment 2), these plans do not include the one (1) additional lot proposed entirely within the limits of the 2007 tentative subdivision plan for Forest Acres (reference Attachment 1) which generates the cause for concern. The approved construction plan is extremely tight, and it is staff's opinion that, with any additional density, the existing design will not meet the conditions of the previous zoning and subdivision requirements.

Based on the above, the approval of the additional density will invalidate the presently approved construction plans entitled "Forest Ridge and Re-Subdivide of Lots 4-6 and 13 Forest Acres" and be the cause for the new submittal of construction plans and calculations. If, in the opinion of the Environmental Engineering Department, the higher density development compromises the level of flood protection afforded by the presently proposed on site and downstream improvements, then, additionally, on site detention facilities designed to attenuate up through 100 year runoff rates must be incorporated into the site design. These facilities could cause any gained density achieved by zoning to be lost by required storm drainage site design.

Water Quality:

With the increase in density, there will be additional Chesapeake Bay compliance requirements. The source for previous Bay Act compliance is no longer available.

## PUBLIC FACILITIES

The need for schools, parks, libraries, fire stations and transportation facilities in this area is identified in the County's adopted Public Facilities Plan, Thoroughfare Plan and Capital Improvement Program and further detailed by specific departments in the applicable sections of this request analysis.

Fire Service:

> The Public Facilities Plan as part of the Comprehensive Plan indicates that fire and emergency medical service (EMS) calls increased by forty-four (44) percent from 2001 to 2011, significantly faster than the County's population increase of seventeen (17) percent. Of the total incidents in 2011, nearly seventy-six (76) percent were medical emergencies and twenty-four (24) percent were fire-related. It is expected with the general aging of the population that medical emergency incidents will increase faster than the rate of population growth over time. Five (5) new fire/rescue stations are recommended for construction by 2022 in the Plan. In addition to the five (5) new stations, the Plan also recommends the replacement/revitalization of four (4) existing stations.
>
> Based on fifty (50) dwelling units (Proffered Condition), this request will generate approximately eleven (11) calls for fire and EMS each year. The deletion of Cash Proffers will leave the impact to Fire and EMS unaddressed.
>
> The Courthouse Fire Station, Company Number 20, currently provides fire protection and EMS. When the property is developed, the number of hydrants, quantity of water needed for fire protection, and access requirements will be evaluated during the plans review process. With the increase in number of dwelling units, the development will be required to provide two (2) points of access in accordance with section 17-76.

Schools:

| Residential Yield: | 50 | | | | | |
|---|---|---|---|---|---|---|
| School | Name | Student Yield From Residential Development * | Membership, 9-30-13 | Functional Capacity, 2013-14 | % of Capacity, 2013-14 | No. of Trailers ** |
| Elementary: | Reams Road | 11 | 506 | 628 | 81% | 0 |
| Middle: | Providence | 6 | 832 | 1,057 | 79% | ** |
| High: | Monacan | 8 | 1,366 | 1,757 | 78% | ** |
| Total | | 25 | | | | |

| Projected Membership and Capacity Trends Over Time *** | | | | | | | |
|---|---|---|---|---|---|---|---|
| School | Name | Projected Membership, 9-30-14 | % of Capacity, 2013-14 | Projected Membership, 9-30-15 | % of Capacity, 2013-14 | Projected Membership, 9-30-20 | % of Capacity, 2013-14 |
| Elementary: | Reams Road | 516 | 82% | 513 | 82% | 535 | 85% |
| Middle: | Providence | 846 | 80% | 856 | 81% | 889 | 84% |
| High: | Monacan | 1,397 | 80% | 1,389 | 79% | 1,408 | 80% |

NOTE: * The Student Yield is based on the FY2014 Cash Proffer Methodology as provided by the Chesterfield County Finance Department.
NOTE: ** If a school is less than 90% of capacity and has trailers, those trailers are not identified in the staff report.

Student Membership is based on membership as of 09-30-13.
School Capacity is based on the 2013-14 Space Utilization Study.

*** DISCLAIMER: *Please note that Projected Membership AND Functional Capacity are updated on an ANNUAL BASIS and are based on the September 30 membership for a given year and the Space Utilization Study Report which is conducted every year. The Space Utilization Study is a report that is conducted annually whereby Planning staff conducts a site visit of every school in the county and the Principal reviews his or her floor plan and identifies the use of every classroom. From that information a report is prepared that calculates the Functional Capacity of that school. The school system needs to know how each of their facilities is utilized for funding and space allocation purposes. Again, it is important to note that these numbers change every year.*

After review of this request, the proposed rezoning case will have a minimal impact on the aforementioned schools involved. However, over time this case, combined with other tentative residential developments, infill developments and zoning cases in the area, could continue to push elementary and secondary schools to capacity. Therefore, the aforementioned units should continue to be subject to full cash proffers, to mitigate the

impact that this proposed development would have on schools. The applicant has not offered measures to address the impact of the development on school facilities.

The projected student membership and capacity trends at this time indicate that there will be an overall increase in membership at the elementary and secondary levels by 2020. Staff continues to monitor student membership on a regular basis in these areas and membership projections are analyzed and updated annually.

Libraries:

Development of the property noted in this case would most likely impact the existing La Prade Library, the existing Clover Hill Library or a proposed new branch in the Reams/Gordon area. A need for additional library space in this area of the County is identified in the Plan. Deletion of Cash Proffers will leave the impact library services unaddressed.

Parks and Recreation:

The Public Facilities Plan identifies the need for three (3) regional parks totaling 600 acres, ten (10) community parks totaling 790 acres, nine (9) neighborhood parks totaling 180 acres, and three (3) water-based special purpose parks. The Plan also identifies the need for urban parks within mixed use developments to compliment and provide linkages to the County's park system. The Plan identifies the need for linear parks and trails and resource-based special purpose parks [historical, cultural and environmental] and makes suggestions for their locations. The Plan also addresses the need to expand existing park sites to meet level of service standards. The Plan also identifies the need to improve access to blueways through the acquisition of easements and properties. Co-location with schools and other compatible public facilities is desired.

By eliminating the Cash Proffers, the applicant has failed to offer measures to address the impacts of this development on parks and recreation facilities.

County Department of Transportation:

The applicant plans to develop fifty (50) lots on the property (Proffered Condition 1). Based on trip generation rates for single-family housing, development of the property could generate approximately 550 Average Daily Trips (ADT). Most of this traffic would ultimately be distributed to Courthouse Road, which is a four (4) lane divided facility at its intersection with Cherylann Road. Based on a 2009 traffic count of 35,879 ADT, Courthouse Road in this area was functioning at a Level of Service D.

The traffic impact of this development must be addressed. Area roads need to be improved to address safety and accommodate the increase in traffic generated by this development. To mitigate the traffic impact of this request, the applicant has proffered to construct a northbound right turn lane along Courthouse Road at Cherylann Road. (Proffered Condition 2)

Citizens traveling northbound on Courthouse Road currently have to turn from a through lane to access Cherylann Road. Based on observations staff performed during the afternoon peak hour, this maneuver adversely impacts northbound through traffic on Courthouse Road. Vehicles traveling northbound have to slow significantly when following a vehicle turning onto Cherylann Road. Providing the proffered right turn lane will partially mitigate the impact of these right turns. In general, providing separate right turn lanes along a roadway increases its capacity, resulting in an improved level of service. Staff supports construction of the right turn lane.

Based on the amount of the transportation component of the current cash proffer ($7,704) and the number of lots planned (fifty (50), the applicant should provide $385,200 in cash or in-kind improvements to mitigate the traffic impact of this proposed development. The actual cost of the proffered improvement cannot be determined until construction is complete and may be more or less than the road component of the cash proffer established by the Board of Supervisors. Staff feels the proffered improvement will address the major traffic impact of this request.

Virginia Department of Transportation (VDOT):

A change in lot density will result in additional traffic generation that may affect required roadway geometry. The change in traffic volume may not significantly affect the road geometry, however, the approved Tentative Plan (Case 07TS0221) may need revision and the subdivision construction plan for Forest Ridge may also need revision.

Financial Impact on Capital Facilities:

|  |  | Per Dwelling Unit |
|---|---:|---:|
| Potential Number of New Dwelling Units | 50* | 1.00 |
| Population Increase | 131 | 2.62 |
| Number of New Students |  |  |
| Elementary | 10.69 | 0.21 |
| Middle | 5.71 | 0.11 |
| High | 7.63 | 0.15 |
| **Total** | **24.03** | **0.48** |
|  |  |  |
| Net Cost For Schools | $ 472,250 | $ 9,445 |
| Net Cost for Parks | $ 62,350 | $ 1,247 |
| Net Cost for Libraries | $ 16,150 | $ 323 |
| Net Cost For Fire Stations | $ 35,450 | $ 709 |
| Average Net Cost Roads | $ 400,950 | $ 8,019 |
| **Total Net Cost** | **$ 987,150** | **$ 19,743** |

*Based on the number of assumed dwelling units (Proffered Condition). The actual number of dwelling units and corresponding impact may vary.

The original zoning case (06SN0127) was approved in August 2006 with the maximum Cash Proffer at the time of $15,600 per dwelling unit (currently escalated by the Marshall and Swift Building Cost Index to $21,431 per unit). The original case also included an option to perform a drainage study that would have reduced the amount of the Cash Proffer to $11,225 (currently escalated to $15,421).

The applicant is requesting the deletion of cash proffers (Condition 2 of Case 06SN0127) and is furthermore offering the development of a northbound right turn late along Courthouse Road at Cherylann Road to address its impact on transportation. In addition, the applicant is proffering density of no more than fifty (50) lots, and an average lot size of 14,700 square feet, if sole access is provided through Forest Acres Subdivision.

As noted, this proposed development will have an impact on capital facilities. Staff has calculated the fiscal impact of every new dwelling unit on schools, parks, libraries, fire stations and roads as $19,743 per unit.

The current Cash Proffer Policy allows the County to assess the impact of all dwelling units in previously approved zoning cases that come back before the Planning Commission and Board of Supervisors using the calculated capital facility costs in effect at the time the case is reconsidered. The applicant has proffered road improvements to mitigate the impact of the development on capital facilities, and staff finds the transportation proffer acceptable for mitigating the road impacts. However, the request falls short of adequately addressing the impact on school, park, library and fire station facilities. While appropriate to maintain the cash proffer approved with Case 06SN0127, the Board of Supervisors has set the current maximum cash proffer at $18,966, an amount lower than what was approved with the original case.

Based on the request, the applicant has chosen not to adequately address the impact of the development on school, park, library and fire station facilities. Consequently, the County's ability to provide adequate facilities to its citizens will be adversely impacted.

## LAND USE

Comprehensive Plan:

> The subject property is located within the boundaries of the Northern Courthouse Road Community Plan, which suggests the property is appropriate for residential use of 2.5 dwellings per acre or less.

Area Development Trends:

> Surrounding properties are zoned Residential (R-9 and R-7) and are developed as part of the Briarcliff, Heatheridge and Forest Acre Subdivision developments or are zoned Agricultural (A) and occupied by single-family dwellings on acreage parcels. It is anticipated that any residential redevelopment of acreage properties in this general area will be consistent with the recommended densities of the Plan.

Zoning History:

> On August 23, 2006 the Board of Supervisors, upon a favorable recommendation from the Planning Commission, approved rezoning to Residential (R-12) on the subject property (Case 06SN0127). With the approval of Case 06SN0127 the applicant offered a Cash Proffer as a means of addressing the impact of the development on necessary capital facilities. In addition, the applicant agreed to certain lot size and density maximums (of 2.1 to 2.9 dwelling units per acre), should the property develop with sole access through adjacent subdivisions.

Comparison of Lot Sizes and Density:

Currently, the ordinance requires a minimum lot size of 12,000 square feet in a Residential (R-12) District. Access to the subject property may be provided through Briarcliff, Heatheridge or Forest Acres Subdivisions.

- Briarcliff Subdivision, Section 4, contains an average lot size of 12,500 square feet and density of 3.3 dwelling units per acre

- Heatheridge Subdivision, Section 2, contains an average lot size of 13,500 square feet and a density of 2.7 dwelling units per acre

- Forest Acres Subdivision, Sections C and D together contain an average lot size of 17,200 square feet and a density of 2.1 dwelling units per acre.

In an effort to address compatibility with adjacent developments through which this property may have sole access, the applicant agreed to average lot sizes and densities consistent with adjacent subdivisions. (Proffered Conditions 6, 7 and 8 of Case 06SN0127)

In 2007, a tentative subdivision plan was approved on the request property that provides for sole access through Forest Acres Subdivision, Sections C and D (Case 07TS0221- Forest Ridge – Attachment 1). This plan depicts forty-seven (47) lots and is in compliance with the maximum density of 2.1 dwelling units per acre, as restricted by Case 06SN0127. Specifically, Proffered Condition 8 of Case 06SN0127 reads as follows:

Any residential lots having sole access through Forest Acres Subdivision shall have an average lot size of 17,400 square feet. Such lots shall not exceed a density of 2.1 dwelling units per acre.

In 2008, a tentative subdivision plan was approved on adjacent property to the south, being a re-subdivision of five (5) recorded lots in Forest Acres Subdivision, Section C (Case 08TS0210 - Forest Ridge - Phase II). Of the proposed eight lots in this re-subdivision, portions of two (2) of the lots extend into the geography of the request property (Attachment 2). As such, these two (2) lots would be counted towards the proffered lot yield for the request property (2.1 dwelling units per acre), yielding forty-nine (49) lots.

The applicant has indicated intent to amend the 2007 approved tentative plan to obtain one (1) additional lot, yielding forty-eight (48) lots. In combination with the two (2) re-subdivision lots, these modifications would increase the total number of lots to fifty (50), yielding a change in density from 2.1 to 2.16 dwelling units per acre. This proposed change of density continues to be consistent with intent of the original Proffered Condition 8 for compatibility with the adjacent Forest Acres development and continues to be within the density limitations suggested by the Plan.

Dwelling Size and Foundation Treatment:

> The minimum square footage for dwellings and foundation treatment approved with the previous zoning would remain in effect with approval of this case. One-story units and units above one-story are currently limited to minimum gross floor areas of 1,500 and 1,800, respectively. In addition, foundation treatment and exposed piers supporting front porches are to be faced with brick veneer.

## CONCLUSION

The requested modification to density would increase the maximum density of the development from 2.1 to 2.16 dwelling units per acre, resulting in an additional three (3) lots with sole access through Forest Acres Subdivision. This amendment continues to maintain compatibility with area development.

The requested modification would also delete the cash proffer in favor of proffered road improvements to mitigate the impact of the development on capital facilities. While staff finds the transportation proffer acceptable in mitigating the road impact, the request falls short of adequately addressing the proposed development's impact on school, park, library and fires station facilities. Consequently, the County's ability to provide adequate facilities to its citizens will be adversely impacted.

Given these considerations, denial of the request to eliminate the cash proffer and approval of the requested increase in density is recommended.

## CASE HISTORY

Planning Commission Meeting (11/15/12):

> On their own motion and with the applicant's consent, the Commission deferred this case to their February 19, 2013 public hearing.

Staff (11/16/12):

> The applicant was advised in writing that any significant, new or revised information should be submitted no later than December 10, 2012 for consideration at the Commission's February 19, 2013 public hearing.

Staff (1/16/13):

> To date, no new information has been received.

Planning Commission Meeting (2/19/13):

    On their own motion and with the applicant's consent, the Commission deferred this case to their May 21, 2013 public hearing.

Staff (2/20/13):

    The applicant was advised in writing that any significant, new or revised information should be submitted no later than March 11, 2013 for consideration at the Commission's May 21, 2013 public hearing.

Staff (4/25/13):

    No new information has been received.

Planning Commission Meeting (5/21/13):

    On their own motion and with the applicant's consent, the Commission deferred this case to their August 20, 2013 public hearing.

Staff (5/22/13):

    The applicant was advised in writing that any significant, new or revised information should be submitted no later than June 10, 2013 for consideration at the Commission's August 20, 2013 public hearing.

Staff (8/1/13):

    To date, no new information has been received.

Planning Commission Meeting (8/20/13):

    On their own motion and with the applicant's consent, the Commission deferred this case to their November 19, 2013 public hearing.

Staff (8/21/13):

    The applicant was advised in writing that any significant, new or revised information should be submitted no later than September 9, 2013 for consideration at the Commission's November 19, 2013 public hearing.

Staff (10/23/13):

>To date, no new information has been received.

Planning Commission Meeting (11/19/13):

>On their own motion and with the applicant's consent, the Commission deferred this case to their January 21, 2014 public hearing.

Staff (11/21/13):

>The applicant was advised in writing that any significant, new or revised information should be submitted no later than November 25, 2013 for consideration at the Commission's January 21, 2014 public hearing.

Staff (12/19/13):

>An additional proffered condition was received.

Applicant, Staff, Area citizens, and District Commissioner (1/6/14):

>A community meeting was held. Questions were raised relative to possible impact on area drainage, with additional discussion about proposed road improvements on Courthouse Road.

Applicant (1/20/14):

>The applicant submitted revised Proffered Condition 2.

Planning Commission Meeting (1/21/14):

>The Planning Commission meeting scheduled for January 21, 2014 was rescheduled to January 23, 2014 due to inclement weather.

Staff (1/21/14):

>Schools submitted revised comments to reflect current school functional capacities based on the 2013-14 Space Utilization Study as well as current school trailer data.

Planning Commission Meeting (1/23/14):

    On their own motion and with the applicant's consent, the Commission deferred this case to their February 18, 2014 public hearing.

    AYES: Messrs. Wallin, Patton, Brown and Waller.
    ABSENT: Mr. Gulley.

Staff (1/24/14):

    The applicant was advised in writing that any significant, new or revised information should be submitted no later than January 27, 2014 for consideration at the Commission's February 18, 2014 public hearing.

Staff (1/27/14):

    To date, no new information has been received.

Planning Commission Meeting (2/18/14):

    The applicant did not accept staff's recommendation, but did accept the Planning Commission's recommendation.

    Mr. Gulley noted that this area is in need of revitalization; that aging neighborhoods need to attract younger residents; and as an infill project, the proposal would have minimal impact on the area's public facilities.

    Messrs. Patton and Waller concurred that the proposal should be considered infill; and that the current Cash Proffer Policy does not promote infill and revitalization.

    Dr. Brown indicated that while in agreement that the project represented infill, no changes had been made by the Board to the Cash Proffer Policy to address infill; and that full removal of cash proffer would require infrastructure costs to be borne by existing County residents.

    Dr. Wallin indicated that focus should be on County-wide public infrastructure needs rather than the needs within a single area; recognized that infill is undefined; noted the importance of incentivizing community reinvestment; and clarified his decision was conflicted and not precedent-setting.

On motion of Mr. Gulley, seconded by Mr. Waller, the Commission recommended approval and acceptance of the proffered conditions on page 2.

AYES: Messrs. Wallin, Patton, Gulley and Waller.
NAY: Dr. Brown.

Board of Supervisor's Meeting (3/12/14):

On their own motion and with the applicant's consent, the Board deferred this case to their July 23, 2014 public hearing.

Staff (3/13/14):

The applicant was advised in writing that any significant, new or revised information should be submitted no later than April 7, 2014 for consideration at the Board's July 23, 2014 public hearing.

Staff (6/19/14):

Revised comments were received from School Board Administration expanding on their previous comments by providing school membership and capacity projections for future years.

To date, no new or revised information has been received from the applicants.

The Board of Supervisors, on Wednesday, July 23, 2014 beginning at 6:30 p.m., will take under consideration this request.





