**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **VIRIDIS DEVELOPMENT CORPORATION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action: 3:14-cv-00589 JRS** |
| | ) |
| **BOARD OF SUPERVISORS OF** | ) |
| **CHESTERFIELD COUNTY, VIRGINIA,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

Plaintiff Viridis Development Corporation ("Viridis"), by counsel, submits this Memorandum in Opposition to Defendants' Motions to Dismiss.

### NATURE OF THE CASE

This is a local zoning case only in the sense that *Miranda v. Arizona*, 384 U.S. 436 (1966), was a local police power case. Both disputes involve the infringement of fundamental private property rights reserved to the people by the United States Constitution.[1] That Viridis' claims arise in the context of a local land use matter should be of no more importance to this Court than *Miranda* having arisen in the context of a local police enforcement action was to the United States Supreme Court. *Miranda* was—and this case should be—resolved by recognition of constitutional rights made applicable to the States by the Fourteenth Amendment. Viridis does not ask this Court to sit as a federal zoning board; rather, it simply requests this Court to find that defendant Chesterfield

---

[1] Virginia, too, recognizes the right to private property is fundamental. Va. Const. Art. I, Section 11 (2014).

County's ("Chesterfield") extortionate and coercive demands—in response to Viridis' request for a zoning amendment—violate the "unconstitutional burdens" doctrine.

At its core, this case is simple. Viridis sought to (i) increase the density of its Forest Ridge real estate development project by one unit and (ii) be relieved from the payment of cash proffers in the approximate amount of $950,000.00[2], because Viridis offered to construct offsite transportation and storm drainage improvements of roughly equal value. Chesterfield had already acknowledged that such work was needed, and the County could not have otherwise required Viridis to perform it as a condition of approving the project.[3] Instead of negotiating with Viridis, as required under its own established policy, Chesterfield demanded that Viridis both perform the work *AND* pay the $950,000.00 cash proffers—thereby **effectively doubling Viridis' contribution** to Chesterfield's coffers.

Such a result is exactly the type of overreaching and nearly extortionate behavior upon which Justice Alito focused in *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013):

> Our decisions in those cases reflect two realities of the permitting process. *The first is that land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take.* By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation. So long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the

---

[2] The Board of Supervisors has set the current maximum cash proffer at $18,966.00. Amended Complaint, Ex. 3, p. 9. Fifty potential dwellings in the Forest Ridge project yield a total payment to Chesterfield of $948,300.00.

[3] *See Bd. of Supervisors of James City County v. Rowe*, 216 S.E.2d 199 (Va. 1995), and *Hylton Enters., Inc. v. Bd. of Supervisors of Prince William County*, 258 S.E.2d 577 (Va. 1979) (local governments may not require developers to install public infrastructure that is remote from the site and not required directly by the development).

> owner is likely to accede to the government's demand, no matter how unreasonable. *Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them.*

*Koontz*, 133 S. Ct. at 2594-95 (internal citations omitted) (emphasis added).

Rather than dragging this Court into the quagmire that is Chesterfield's zoning policy, Viridis merely requests this Court to apply (i) the straightforward Federal Constitutional standards under *Koontz* to the "pay–to–play" game that Chesterfield imposed upon Viridis, and (ii) the limits set by the Virginia General Assembly when it mandated that conditional zoning be reasonable and ***address needs arising from the rezoning itself***. In so doing, this Court will conclude that Chesterfield's demand for both the payment of full cash proffers (which by Chesterfield's own definition addresses all "needs" arising from the rezoning) **AND** construction of public infrastructure of the same approximate value is a violation of Viridis' constitutional rights and should be heard by this Court.

### SUMMARY OF REASONS WHY
### CHESTERFIELD'S MOTION TO DISMISS SHOULD BE DENIED

Chesterfield's Motions to Dismiss ("Chesterfield's Motion") should be denied for the following reasons[4]:

• Chesterfield's abstention and *Williamson* arguments (set forth in Chesterfield's Motion at Paragraphs 2 and 3, and argued in its Memorandum in Support ("Chesterfield's Memorandum") as Legal Arguments I and II) are flawed because this is an "unconstitutional conditions" case, sounding in the Fifth Amendment. The *Williamson* ripeness defense applies to takings claims where a state compensation action is available. Where, as here, the

---

[4] Chesterfield's Motion and the Legal Argument set forth in its Memorandum do not track one another; this summary resolves that confusion by cross-referencing the paragraph of the Motion to Dismiss with the relevant section of the Legal Argument in Chesterfield's Memorandum.

claim is predicated, not on a taking, but on the unconstitutional burdening of a protected right, then (i) none of the prudential reasons that support abstention under *Burford v Sun Oil Co.*, 319 U.S. 315 (1943), are present, and (ii) *Williamson County Reg. Planning v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), simply does not apply because there  is no state procedure to provide "just compensation" for the unconstitutional burdening of a protected right.

• Even if *Williamson* is applied to the Amended  Complaint, Chesterfield's *Williamson* argument fails because (i) Chesterfield's decision denying Viridis' application to amend the zoning  on the Forest Ridge project is final, (ii) there is no requirement under 28 U.S.C. § 1983, that Viridis exhaust administrative and judicial procedures " by which an injured party may seek  review of an adverse decision and obtain a remedy if the decision is found to be  unlawful or otherwise inappropriate", *Williamson*, 473 U.S. at 192-93, and (iii) there is no state court "just  compensation" procedure to which to resort, since there has been no taking.

• Chesterfield's Motion Paragraph 1 ( argued at Section III of the Legal Argument) relying exclusively on *National Association of Homebuilders v. Chesterfield County*,  93 F.3rd 1180 (4th Cir. 1996), is unpersuasive because that case was a *facial* challenge to Chesterfield's cash  proffer policy under the Fifth Amendment.  In stark contrast, the instant case asserts an *as-applied* challenge to Chesterfield's imposition of excessive conditions on Viridis' request for a zoning  amendment, which conditions run afoul of the "unconstitutional conditions" doctrine.

• Chesterfield's Motion directed at the "purely state claims . . . Count II" of the Amended  Complaint (Chesterfield's Motion Paragraph 4, argued at Section IV(a) of the Legal  Argument) fails because Chesterfield mischaracterizes Viridis' claims in Count II in an

apparent attempt to convince the Court that Count II centers on the question of whether Chesterfield's proffer authority is limited to transportation issues. Instead, Count II establishes that Chesterfield's excessive demands for maximum cash proffers (which are calculated to compensate Chesterfield for all of the impacts arising from and related to an individual development—as required by Va. Code § 15.2-2296—*when combined with* like-kind contributions of equal value (effectively *doubling-up* on Viridis) exceed the authority granted Chesterfield by the State. Local government actions which exceed the authority granted under the Commonwealth's statutes are *ultra vires* under Virginia's long standing Dillon Rule—and therefore unconstitutional.

• Chesterfield's Motion to Dismiss any claim predicated on Va. Code § 15.2 -2208.1 on the ground that the statute divests this Court of its supplemental jurisdiction to hear and decide certain state claims suggests that the Virginia General Assembly has the authority to divest this Court of its constitutionally-granted subject matter jurisdiction. Chesterfield's position runs afoul of the Supremacy Clause (U.S. Const. Article VI, Clause 2) and smacks of the type of "states rights/nullification" argument resolved close to two centuries ago. *See Cooper v. Aaron,* 358 U.S. 1 (1958), *Cohens v. Virginia,* 9 U.S. (6 Wheat.) 264 (1821)*, Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304 (1816). Instead, this provision is more properly interpreted as a venue provision.

## STATEMENT OF FACTS

There is no need to restate the facts as set forth in the Amended Complaint or Chesterfield's Motion, other than to correct a number of misstatements and mischaracterizations by Chesterfield. First, Chesterfield goes to great lengths to restate the Board of Supervisor's comments at the public hearing on Viridis' application so as to characterize the Board's action as

being based on anything *other than* Viridis' objection to paying both the maximum cash proffers and performing public infrastructure work unrelated to its project.[5]   This was a charade and a pretext for the real reason—Viridis refused to pay double the amount it was required to pay under Chesterfield's own policy.  (Amended Complaint, ¶¶ 4, 35, and 40(f)-(i).)   Despite the reference to the videotape of the Board of Supervisors' hearing on Viridis' application (Amended Complaint, ¶ 35), this remains a question of fact and the process by which Supervisor Warren's formal motion to deny Viridis' application came about is important to a final determination of the truth.[6]   Viridis should at least have the opportunity to test Chesterfield's assertions about its reasons for denying the application.[7]

Additionally, under long-standing Virginia law, Chesterfield could not condition approval of Viridis' project on the public infrastructure improvements offered by Viridis in exchange for the addition of one lot to the project and removal of the cash proffer requirement. The transportation improvements (i.e., construction of a turning lane at the intersection of Courthouse Road and Cherylann Street) are not on the site of Viridis' project and do not directly serve the project.  *See Hylton Enterprises, Inc. v. Bd. of Supervisors of Prince William County*, 258 S.E.2d 577 (Va. 1979).  The Virginia Supreme Court has held that localities have neither

---

5 Whether or not the public transportation infrastructure and storm drainage work arises from and is reasonably related to Viridis' project is important because it is well-established law in Virginia that local governments cannot force a developer to do "off-site" that which is not caused by or arise from the development itself.  *See Hylton Enters., Inc.*, 258 S.E.2d at 580-81.

6 This question also becomes important under Va. Code Section 15.2-2808.1.  On a finding of an unlawful basis for denial of the application, the burden is shifted to the local government to prove otherwise.

7 By the time of public hearing, Viridis had already given notice to the Board of its intention to challenge its denial of the application, as required by Va. Code Section 15.2-2808.1.  One can properly assume that the various comments of the individual supervisors and the formal motion to deny Viridis' application were prepared in some anticipation of litigation.

express nor implied authority to require a developer of a subdivision to construct off-site roads as a condition of plat approval.  *Id*. at 581.  Similarly, the storm drainage improvements offered by Viridis are designed to alleviate a long-standing flooding problem that was caused by a storm drainage facility owned and managed by Chesterfield, *not* by Viridis' project.  (Amended Complaint, ¶¶ 21-22.)  Viridis proposed an engineering solution to the problem which was approved by Chesterfield, notwithstanding the language of the staff report which may have been accurate when first drafted, but which failed to take into account the County's subsequent approval of the proposal made by Viridis.  (Amended Complaint, ¶¶ 26-28.)  To suggest otherwise, as Chesterfield does in its Statement of Facts, is simply wrong and disproved, as Chesterfield's own staff has approved the storm drainage improvements.

There is no doubt that the transportation infrastructure improvements and the storm drainage improvements constituted valuable public improvements that could not have been required otherwise by Chesterfield and which were of approximately equal value to the maximum cash proffers that Viridis wanted waived in exchange for these "in-kind" public improvements.  Viridis' grievance is not that Chesterfield wanted one or the other or some combination thereof, but rather that Chesterfield wanted *both the work and the money*, thereby effectively doubling Viridis' donation to the public coffers.

## STANDARD OF REVIEW

I.      Rule 12(b)(1) Motion[8]

A challenge to the District Court's subject matter jurisdiction places the burden on the plaintiff to establish there is such jurisdiction.  This Court can look beyond the pleadings if there

---

[8] It is unclear why Rule 12(b)(1) is invoked, except that abstention and exhaustion of remedies arguments do not fit neatly within Rule 12(b)(6).  Nonetheless, as neither is jurisdictional, 12(b)(1) does not apply.

is a dispute over subject matter jurisdiction; however, where the jurisdictional facts of the case are "intertwined with the facts central to the merits of the dispute" the motion should be denied and the case should be decided on the merits. *See Adams v. Bain*, 697 F.2d 1213, 1219-20 (4th Cir. 1982).

II.      Rule 12(b)(6) Motion

A motion to dismiss tests the sufficiency of a complaint; it does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  This Court must accept as true the facts pled by Viridis when ruling on Chesterfield's Motions made pursuant to Rule 12(b)(6).  *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir. 2002).  If a court by (i) regarding all well-pleaded allegations in the plaintiff's complaint as true and (ii) drawing all reasonable factual inferences therefrom in the plaintiff's favor finds that a plaintiff is entitled to relief, then the court should deny the motion to dismiss. *Cf. Edwards*, 178 F.3d at 244.

A court is charged with determining whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged.  *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).  "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely, but that is not the test."  *Id.*  It is inappropriate to address the merits on a 12(b)(6) challenge, as such challenges should be "dealt with through summary judgment under Rule 56."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

Although "detailed factual allegations" are not required, the United States Supreme Court has made clear the allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." *Bell Atlantic Corp. v. Twombly.* 550 U.S. 544, 555 (2007) (internal citations omitted). The Amended Complaint satisfies *Twombly*.

## LEGAL ARGUMENT

I.     Abstention Under *Burford* is Not Appropriate Here

This is not an inverse condemnation case, nor is it a case asserting a state-based claim wrapped in federal clothing.  Count I seeks to prevent Chesterfield from denying a permit to Viridis in violation of its constitutional right to be free from a coercive and illegal government taking.   The claim is based "on an overarching principle known as the unconstitutional conditions doctrine that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013).  This prohibition has been previously applied in two land use cases:  *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

As explained by the United States Supreme Court, "*Nollan* and *Dolan* 'involve a special application' of this doctrine that protects the Fifth Amendment right to just compensation for property the government takes away when owners apply for land use permits." *Koontz*, 133 S. Ct. at 2594. (emphasis in original.)   *Nollan* and *Dolan* reflect the realities of the permitting process by recognizing "that land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take." *Id*. at 2594-95.

Balanced against this potential coercion, of course, is the principle that exactions to offset the public costs of development are allowed.  *Id*. at 2595.  *Nollan* and *Dolan* "enable permitting

authorities to insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in 'out and out . . . extortion' that would thwart the Fifth Amendment right to just compensation." *Id.* (internal citations omitted). Thus, "the government may choose whether and how a permit applicant is required to mitigate the impacts of proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." *Id.*

As explained in the Statement of Facts, *supra*, Defendants sought unconstitutionally to coerce a double-taking for Viridis' development of Forest Ridge. (*See also* Amended Complaint at ¶ 4.) They abused Viridis by conditioning the granting of a permit on (i) the payment of the maximum cash proffer from Viridis of approximately $19,000.00 per unit (which equals a payment of nearly $950,000.00 ***combined with*** (ii) the comparably-valued promise to build road improvements and alleviate a drainage issue that extended far beyond that caused by the development. Chesterfield gave no credit whatsoever for Viridis' offer to install these needed public works, as had been done when Forest Ridge was originally rezoned in 2006. (Amended Complaint at ¶¶ 18, 20, and 36.) There are no complexities involved in this straightforward issue, and abstention is neither required nor warranted.

When a federal court is faced with deciding difficult questions of state law which affect state public policy decisions that could be disruptive of state efforts to enact and carry out such policies, abstention has been permitted. *Burford v. Sun Oil Co.,* 319 U.S. 315, 332-33 (1943). Abstention is favored where a state court would have the opportunity to rule on state law claims that could prevent the necessity for a decision on a constitutional question. *Id.* at 333, n.29. Abstention is "tempered by the truism that 'the federal courts have a virtually unflagging obligation to exercise jurisdiction.'" *MLC Auto, LLC v. Town of S. Pines*, 532 F.3d 269, 280 (4th

Cir. 2008) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988)).  Furthermore, abstention "'remains the exception, not the rule,' and the Supreme Court, in order to safeguard this principle, has 'carefully defined . . . the areas in which abstention is permissible.'"  *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989)).

*Burford* is inapplicable here because Viridis does not claim Defendants have failed to weigh relevant state law factors in its federal claim.  Instead, Viridis has pled an "unconstitutional conditions" claim due to the demand for double payment for the same impact.  No complex state statutory scheme or policy is implicated here.  Virginia has no interest in furthering unconstitutional coercive takings.

While the Fourth Circuit has been particularly protective of states' policies and control over zoning and land use laws as seen by the cases cited by Chesterfield, it has done so where litigants attempted to "disguise the [state] issues as federal claims."  *Pomponio v. Fauquier County Bd. of Supervisors*, 21 F.3d 1319, 1327 (4th Cir. 1994).  *Pomponio* upheld abstention because "Pomponio's argument boils down to an assertion that his plan complied with the zoning laws and the local authorities wrongfully disapproved his plan by misapplying the laws and by abusing their authority in the decisionmaking process."  *Id.* at 1328.  Unlike here, there was no unconstitutional condition claim.  Further, the Fourth Circuit distinguished *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* where abstention was found to be improper because "the claim asserted there was not 'a claim that a state agency has misapplied its lawful authority' or has failed to take into consideration or properly weigh relevant state law factors."  *Id.* (citing *New Orleans Pub. Serv., Inc.*, 491 U.S. at 362).

Outside the zoning realm, Defendants rely upon *Johnson v. Collins Entertainment Co.,* 199 F.3d 710, 715 (4th Cir. 1999), a case brought by habitual gamblers against video poker

operators, seeking an injunction preventing the video operators from paying more than $125.00 daily to any one customer. *Johnson* fails to support Defendants' argument for abstention, however, because the district court was required to interpret state gambling statutes that had not yet been addressed by a state court in an area of a "basic problem of South Carolina public policy." *Id.* at 720. Other questions were also presented regarding whether cash payouts were in fact unfair trade practices under South Carolina law. *Id.* Even the RICO claims in *Johnson* depended on violations of state law. *Id.* at 720-21. Thus, *Johnson* is an example of a state claim being wrapped in a federal cause of action. It is inapposite here.

Although abstention is reviewed only for an abuse of discretion, "the discretion to abstain is tempered by the truism that 'the federal courts have a virtually unflagging obligation to exercise their jurisdiction.'" *Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 (4th Cir. 2013) (quoting *MLC Auto, LLC*, 532 F.3d at 280). *Nags Head* is particularly instructive in the sound exercise of discretion even in a land use dispute. Although the claims "involve[d] a sensitive area of North Carolina public policy," the Fourth Circuit reversed the district court's decision to abstain because the resolution of the claims was not "sufficiently difficult or disruptive of that policy to free the district court from its 'unflagging obligation to exercise its jurisdiction.'" *Id.* at 393 (quoting *In re Mercury Constr. Corp.*, 656 F.2d 933, 943 (4th Cir. 1981)).

*Nags Head* involved issues of timing of zoning amendments, condemnation, nuisance law, permitting issues and other traditional state regulated issues. The Fourth Circuit first acknowledged that the case seemed to fit the trend to allow abstention over state and local land use and zoning laws. Then it noted that the locality had clearly overstepped its bounds because under state law it lacked authority to enforce a public trust doctrine. *Id.* at 397-99. Of even more critical importance to the instant case, however, is the Court's refusal to allow abstention of

federal constitutional claims that may intersect with land use and zoning laws but are not merely state law in federal clothing. *Id*. *Nags Head* stands in stark contrast to *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013), a case cited by Defendants, where a claim turned entirely on a phrase used in a state statute and *Burford* abstention was appropriate.

The facts here are unlike those in *Northern Va. Law Sch., Inc*. v. *City of Alexandria*, 680 F. Supp. 222 (E.D. Va. 1988) cited by Chesterfield in support of the proposition that this is a zoning appeal case. *Northern Va. Law* was decided only months after *Nollan* and years before *Dolan*. Not surprisingly, the opinion is silent on the *Nollan/Dolan/Koontz* "unconstitutional conditions" doctrine because no such claim was made. Instead, while brought as a straightforward takings case under the Fifth Amendment, the case was held by the district court to be nothing more than an inverse condemnation action, i.e., a state-based claim wrapped in federal constitutional clothing. *Id*. at 226-27. When so characterized, the case fell within the Fourth Circuit's admonition that garden variety land use cases should not be turned into federal causes of action. *Id*.

*Northern Va. Law* was filed only after a request for rezoning was denied. Plaintiff claimed a taking because the rezoning request left its property without access to a street. *Id*. at 223. Thus, the case did not involve any alleged coercive use of governmental power. Moreover, the case also presented a "dispositive and novel" question of Virginia law, which the court found was more appropriately decided in the first instance by a Virginia state court. *Id*. at 227. The court concluded its abstention discussion by stating "this Court is convinced that the Virginia state courts should consider plaintiff's allegations before this Court addresses any federal

constitutional issues which may be involved." *Id*.  In the instant case, however, federal constitutional issues are front and center.

Not a single authority in the section on abstention in Defendants' Memorandum addresses whether the *Dolan/Nollan/Koontz* "unconstitutional conditions" doctrine was the basis for the constitutional claim.  These important constitutional principles should not be relegated in the first instance to state courts.  In an area identified by the United States Supreme Court as particularly subject to abuse by local officials, litigants should not be held hostage by state court time delays and procedures to ensure the protection of their constitutional rights.

Furthermore, Defendants try to squeeze this proceeding into the inverse condemnation mold when that is not what underlies Count I of the Amended Complaint.  It is the Defendants' coercive requirement that Viridis pay twice for the identified effects or be denied its permit that constitutes the constitutional violation—not the "taking" of the property because of the denial of the permit.  Thus, there is no difficult issue of state law to be determined.  Instead there is a rather straightforward question of federal constitutional law to be determined.

The instant case is more like *Nuefeld v. City of Baltimore*, 964 F.2d 347 (4th Cir. 1992). In *Neufeld*, First and Fourteenth Amendment constitutional challenges to a zoning ordinance that restricted the size of satellite dishes were found to be "poor candidates for *Burford* abstention." *Nuefeld*, 964 F.2d at 350.  These constitutional challenges did not "present difficult questions of state law concerning peculiarly local issues, nor would a federal decision disrupt the efficacy of an important and coherent state policy."  *Id*. at 350-351.  A decision here that Chesterfield committed a constitutional violation by its coercive acts likewise fails to implicate state law.

Far from sitting as a zoning board of appeals as suggested on page 12 of Chesterfield's Memorandum, this Court would be fulfilling one of the most important and traditional functions

of the federal judiciary:  safeguarding constitutional rights and interpreting the application of those rights to coercive state conduct.   Abstention is simply not warranted.

II.      *Williamson* Does Not Apply; Even if it Did, This Case is Ripe for Adjudication

      A.      *Williamson* does not apply because Viridis' Amended Complaint states a claim under the unconstitutional burdens doctrine, not a classic Fifth Amendment takings case

The rationale underlying the dual-pronged ripeness standard in *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*,  473 U.S. 172 (1985), was based on the Court's finding that no Fifth Amendment taking occurs until the question of just compensation is resolved. The Court determined the claim to be unripe because (i) the underlying zoning decision was not final[9] and (ii) the claimant had not been denied just compensation at the state court level. *Williamson*, 473 U.S. at 191, 195.   In the latter instance the Court found that the Fifth Amendment does not prohibit takings of property, but only takings "without just compensation"—thereby concluding that a Fifth Amendment taking claim does not materialize until the claimant has been denied just compensation in state court.   *Id*. at 194-95.   The *Williamson* Court found that the land use claimant needed to use the state inverse condemnation procedure and suffer a loss thereunder for its claim to be cognizable. *Id*. at 196-97.

*Williamson* has been severely criticized both as "a concept that exists without a logical or doctrinal basis and as a rule that is self-defeating and unfair in practice because it nullifies, instead of secures, federal court review" of important federal claims.   J. David Bremer, *The Rebirth of Federal Takings Review? The Courts "Prudential" Answer to Williamson County's Flawed State Litigation Ripeness Requirement,* 30 Touro L. Rev. 319, 319 (2014), *see also id*. at 319 n.3 (listing examples).   Indeed, four of the members of the Supreme Court have

---

[9] Although the land use application had been denied, the Court found the availability of variances and special exceptions rendered the denial interlocutory.   No such concerns are present here.

characterized *Williamson* as "mistaken."  *San Remo Hotel v. City and County of San Francisco,* 545 U.S. 323, 348 (2005) (Rhenquist, C.J., O'Connor, J., Kennedy, J., and Thomas, J., concurring).  Focusing on *Williamson's* second prong, Chief Justice Rhenquist, speaking for himself and three colleagues, criticized the state litigation requirement, noting (i) that the court had subsequently undercut the concept by finding it to be a "prudential" rather than jurisdictional requirement in *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725 (1997), and (ii) that it was "not obvious that either constitutional or prudential principles require claimants to utilize all state compensation procedures before they can bring a federal takings claim."  *San Remo Hotel,* 545 U.S. at 349 (citing *Patsy v. Bd. of Regents of Fla.,* 457 U.S. 496 (1982)).

Rhenquist also observed that the *Williamson* jurisprudence had never been founded on any principle of comity towards state courts and that no such principle had developed since the case was decided.  *Id*. at 350.  Confronting the same argument underlying Chesterfield's *Williamson* motion in this case, Rhenquist addressed the idea that "state courts are more familiar with the issues involved in local land-use and zoning regulations, . . . [suggesting] that this makes it proper to relegate federal takings claims to state court."  *Id*.  As to this idea, he found that it made no sense to "hand authority over federal takings claims to state courts, based simply on their relative familiarity with local land use decisions and proceedings, while allowing plaintiffs to proceed directly to federal court in cases involving, for example, challenges to municipal land-use regulations based on the First Amendment or the Equal Protection Clause."  *Id.* at 350-51 (internal citations omitted).

In closing, Rhenquist and three other members of the Court noted that the "justifications for [the] state-litigation requirement are suspect, while its impact on takings plaintiffs is dramatic," and urged *Williamson's* reconsideration.  *Id.* at 352.  Their analysis is sound.

Notwithstanding the fallacy of its logic and doctrinal basis, the prudential state litigation rule of *Williamson* remains the law.   Yet, like those land-use cases arising under the First Amendment and the Equal Protection Clause, the *Williamson* doctrine does not apply to the instant action because Viridis' "unconstitutional burden" claim does not depend on a state court denial of compensation to ripen into a justiciable claim.   Unlike the classic Fifth Amendment takings case, Viridis' "unconstitutional burden" claim arises in the "special context of land-use exactions." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 547 (2005).  Where the "paradigmatic taking" requiring just compensation is a governmental appropriation or invasion of a property right, or, in the case of a regulatory action, something so onerous as to be tantamount to a physical invasion, Fifth Amendment unconstitutional conditions claims are in a "special context," and subject to a separate analytical framework. *Id.* at 537-539.

In the land use exaction context, like the instant case, the cause of action is not for a taking *per se* or a regulation that is tantamount to a taking.  Rather, the cause of action is the *unconstitutional burdening of a protected civil right* – in this case the right that "'the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government, where the benefit has little or no regulatory relationship to the property.'"   *Id.* at 547 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)). Inasmuch as the logical basis for the unconstitutional conditions doctrine is grounded in the burdening of a constitutional right (rather than in the taking of property), the logic of *Williamson's* ripeness doctrine—which holds that the Fifth Amendment constitutional right lies in the uncompensated taking—renders *Williamson* inapplicable to claims present here.[10]

---

[10] This is an inescapable conclusion.  Chesterfield's citation of *Alto Eldorado Partnership v. County of Santa Fe,* 634 F.3d 1170 (10th Cir. 2011) and *Paramount Contractors and Developers, Inc. v. City of Los Angeles,*  805 F.Supp. 2d 977 (C.D. Cal. 2011), which simply

It is significant, as the Court recognized in *Koontz* that Viridis' rezoning application was denied, leaving it with the development rights from the original 2006 rezoning in place. *See Koontz*, 133 S.Ct. at 2596-97. As Chesterfield has noted, the denial of the request to amend the 2006 rezoning left Viridis in a position with no uncompensated taking.[11] (*See* Chesterfield's Memorandum, at 21 (discussing the need to make "a determination as to whether the government actually interfered with the plaintiff's antecedent bundle of rights.")) Unlike a Fifth Amendment Takings Claim, the gravamen of an "unconstitutional conditions" claim lies not in the taking, but in the coercive attempt by the government to force a person to give up a constitutionally protected right in exchange for some permissive government benefit. That is why the *Koontz* Court made it abundantly clear that it matters not whether the government approves or denies the land use application; the constitutional violation lies in the attempt to coerce a person into waiving constitutional rights in exchange for some benefit.

> The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government *approves* a permit on the condition that the applicant turn over property or *denies* the permit because the applicant refuses to do so.
>
> · · ·
>
> That is not to say, however, that there is no relevant difference between a constitutional taking and the denial of a permit based on an unconstitutionally extortionate demand. Where the permit is denied and the condition is never imposed, **nothing has been taken**. While the unconstitutional conditions doctrine recognizes that this *burdens* a constitutional right, the Fifth Amendment mandates a particular *remedy*—just compensation—only for takings. In cases where there is an excessive demand but no taking, whether money damages are available is not a question of federal constitutional law but

---

impose the *Williamson* shibboleth in circumstances which are factually distinct from the Viridis matter, is unavailing.

[11] Nonetheless, Viridis has suffered damages. Specifically, delay damages arising from extended holding costs—including debt service—and increased construction expenses are involved, as a result of the unconstitutional conditions and denial of Viridis' request to amend its rezoning.

of the cause of action—whether state or federal—on which the landowner relies.

*Koontz*, 133 S. Ct. at 2595, 2597 (emphasis added to bolded words).

This is precisely the factual scenario presented in the instant case.  Chesterfield denied Viridis' zoning application because Viridis refused to accede to Chesterfield's demands to pay the maximum cash proffers and to perform off-site public infrastructure work that Chesterfield could not otherwise legally require of Viridis.[12] *See Bd. of Supervisors of James City County v. Rowe*, 216 S.E.2d 199 (Va. 1995) (county may not require a landowner to dedicate land and make off-site road improvements through the zoning regulations)[13]; *Hylton Enters., Inc. v. Bd. of Supervisors of Prince William County*, 258 S.E.2d 577 (Va. 1979) (county may not require dedication of land and construction of off-site road improvements as a condition of subdivision plat approval).  When Chesterfield denied Viridis' request to amend the rezoning, Chesterfield took no property from Viridis; however, it violated Viridis' Fifth Amendment right not to be strong-armed into surrendering property (either money or equally valuable public infrastructure work) to which the County was not entitled.

---

[12] If Viridis had accepted Chesterfield's demands to pay the maximum cash proffer in addition to the public infrastructure work Viridis had offered, then (i) Viridis would have to make the cash payments and complete unnecessary public infrastructure work of roughly the same value as the cash proffer and (ii) Viridis would be paying twice for its transportation impacts, since the maximum cash proffer necessarily included what Chesterfield had already calculated to be the cost of the impact that Viridis' project would have on transportation infrastructure in the County. (*See* Amended Complaint ¶¶ 4 and 40(f).)  **Chesterfield demanded a combination of cash payment and public infrastructure work that was double what its own impact calculations could justify under the *Nollan/Dolan/Koontz* nexus and rough proportionality tests.**

[13] The Virginia Supreme Court has held there is "nothing in the constitution, enabling states, or case law of Virginia which empowers the sovereign to require private landowners, as a condition precedent to development, to construct or maintain public facilities on land owned by the sovereign, **when the need for such facilities is not substantially generated by the proposed development**." *Rowe*, 216 S.E.2d at 209 (emphasis added).

Chesterfield's ripeness defense under *Williamson* is misplaced because this is not a classic takings case and, thus, the logical and doctrinal underpinnings of *Williams* are not present.  As time passes and more of these cases are presented to the federal courts, they are recognizing that *Williams* is inapplicable to cases in which there is no available state taking remedy.  *See Coleman v. District of Columbia,* 2014 U.S. Dist. Lexis 137526, at *26-*27 (D.D.C. 2014); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Florida*, 727 F.3d 1349, 1357 (10th Cir. 2013) (declining to impose *Williamson*'s ripeness doctrine to a land-use case where it was alleged the decision was based on racial animus, because "the injury is complete upon the municipality's initial act.").  Where the underlying rational for *Williamson* ripeness is missing, the Courts have not imposed *Williamson*.  *See San Remo Hotel*, 545 U.S. at 350-51; *Bowlby v. City of Aberdeen*, 681 F.3d 215 (5th Cir. 2012).

This Court should be "mindful that the abnegation of federal jurisdiction is a serious measure to be taken only under 'extraordinary and narrow' circumstances," and conclude that the circumstances of this case do not warrant its dismissal based on the inapplicable prudential doctrine cited in *Williamson.  Town of Nags Head v. Toloczko* 728 F.3d 391, 393 (4th Cir. 2013)

B.     Even if *Williamson* is applied to this case, Viridis' claim is ripe for judicial determination because (i) the Board of Supervisor's zoning decision is final, and (ii) Viridis is not required to exhaust administrative or judicial remedies before pursuing a Section 1983 case.

In *Williamson*, the Court held that a Fifth Amendment claim for damages based on a local government's application of its downzoning ordinance to an existing development project should not have been heard in federal court because the developer had "not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation."  473 U.S. at 186.  The Court explained its finality requirement by reiterating that "a claim that the application of

government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* Applying this standard, the *Williamson* Court found that the downzoning case was not final at the local government level, because the developer elected not to seek variances from the same local government entity that denied its application to proceed with the development. *Id.*

The factual situation in the present case is entirely different. The Board of Supervisors is the governing body of Chesterfield County and empowered to exercise the planning and zoning authority for the County. (Amended Complaint, ¶ 11.) It is the final arbiter of zoning decisions at the county level and it flatly rejected Viridis' application for an amendment to the zoning applicable to the Forest Ridge project. There are no variances or special exceptions that could relieve Viridis of the cash proffer requirements or increase the density of its development. To suggest that Viridis could have reapplied to the Board with a different plan would simply subject it to a never ending series of applications and denials before the same legal entity that had denied the initial application for an amendment.

Chesterfield never contends that its decision was other than final; instead, Chesterfield contends that Viridis should seek compensation through the Virginia declaratory judgment and inverse condemnation procedures.

> Virginia law provides remedies for land owners to obtain compensation for governmental takings, including claims for inverse condemnation, pursuant to Virginia's declaratory judgment statute. . . . Because Viridis has not secured a final state judgment denying it just compensation for the alleged taking of its property due to the 2006 rezoning, Viridis' claim is not ripe under Williamson County and must be dismissed. (citations omitted)

(Chesterfield's Memorandum at 17.)

21

Yet Chesterfield then argues that the denial of Viridis' application for a zoning amendment "did not interfere with Viridis' antecedent bundle of rights—it left those rights intact under the 2006 zoning case.  At best, the Board merely refused to 'enhance the value" of Viridis' Property when it denied Viridis' rezoning request." (*Id.* at 22.)  The quoted language is nothing more than an elaborate way of arguing that "no property was taken from Viridis."  State and federal courts in Virginia have repeatedly ruled that the diminution in value or failure to enhance value arising in the context of a zoning decision is not compensable. *See City of Virginia Beach v. Virginia Land Investment Ass'n No. 1*, 389 S.E.2d 312, 314 (Va. 1990) (a downzoning, which was later reversed, effected no taking for the time that a planned unit development was delayed); *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 286 (4th Cir. 1998) ("a regulatory deprivation that causes land to have 'less value' does not necessarily make it 'valueless'").

If there was no compensable Fifth Amendment taking, then of what use is resorting to Virginia's remedies to obtain compensation for governmental takings?  Moreover, Virginia provides no "appellate" route to contest the validity of Chesterfield's zoning decision.  Virginia Code Section 15.2-2285(F) provides that "(e)very action contesting a decision of the local governing body adopting or failing to adopt a proposed zoning ordinance or amendment thereto . . . shall be filed within thirty days of the decision with the circuit court having jurisdiction of the land affected by the decision."  The statute, however, also states that "nothing in this subsection shall be construed to create any new right to contest the action of a local governing body."  Va. Code Ann. § 15.2-2285(F).  This, then, is the type of statutory scheme contemplated by *Williamson*, when the Court recognized that there is no requirement in a suit predicated on 42 U.S.C. Section 1983 for a plaintiff to exhaust state judicial remedies "by which an injured party

may seek review of an adverse decision and obtain a remedy if the decision is found to by unlawful or otherwise inappropriate." *Williamson*, 473 U.S. at 193.

The Amended Complaint is not stating an inverse condemnation claim, nor seeking just compensation. There is no requirement to exhaust state level judicial review remedies, as opposed to just compensation procedures. Thus, Chesterfield's Motion to Dismiss should be denied insofar as it is predicated on *Williamson*.

III.    Chesterfield's Rule 12(B)(6) Argument Relying on *Nat'l Ass'n of Homebuilders v. Chesterfield*, 93 F.3d 1180 (4th Cir. 1996), is Inapplicable to the Instant Case

Chesterfield constructs a classic "straw man" argument in claiming that *Nat'l Ass'n of Homebuilders v. Chesterfield*, 93 F.3d 1180 (4th Cir. 1996), requires this Court to dismiss Count I of the Complaint. It undertakes a lengthy review of the "nexus" and "rough proportionality" standards. Then it cites *Homebuilders* for the proposition that the circuit court rejected an argument that the "rough proportionality" test requires stringent individualized assessments in calculating cash proffers—individualized assessments approaching "exact proportionality." Finally, Chesterfield attacks the "straw man" it created by mischaracterizing Count I of Viridis' Amended Complaint as asserting an exact proportionality claim.

Nothing could be further from the truth. *Homebuilders* involved a *facial* attack on the constitutionality of Chesterfield's cash proffer policy, in which the complainant argued before both the district court and the circuit court, that rezoning decisions made according to the then-existing cash proffer policy "are incapable of meeting the 'rough proportionality' standard laid out in *Dolan v. Tirgard* and that the Policy is accordingly facially void." *Nat'l Ass'n of Homebuilders*, 907 F.Supp. at 168. At the district court, Chesterfield conceded that the nexus and rough proportionality tests are applicable to "as-applied" rezoning cases, but not to

invalidate the entire policy.  The district court dismissed the complaint because it found that the cash proffer policy was obviously capable of being applied in a constitutional manner.  *Id.*

On appeal, the Fourth Circuit affirmed in a *per curiam* opinion.  It found the appellant was arguing for the application of a much more strict and exacting cash proffer policy than would be appropriate under the "rough proportionality" standard.  *Nat'l Ass'n of Homebuilder's v. Chesterfield County*, 93 F.2d 1180 (4th Cir. 1996).

Neither opinion is controlling in the case before this Court.  Viridis is not making a *facial* challenge to Chesterfield's cash proffer policy.  It contends that the policy *as applied to it*, in the denial of its application for a zoning amendment, failed to meet the "nexus" and "rough proportionality" standards established by the Court in *Nollan*, *Dolan* and *Koontz* for following reasons:

• the so-called public infrastructure "impacts" of Viridis' development which purportedly supported the cash proffers demanded by the county were, in fact, illusory (Amended Complaint, ¶¶ 40 (a)-(d) and (g)),

• by requiring Viridis to pay the maximum cash proffers *and* to construct road improvements and storm drainage improvements  "when the need for such improvements is not substantially generated by the proposed development,"[14] Chesterfield demanded that Viridis *pay almost double* what the County itself has estimated to be the total "cost" of the project's impact on public infrastructure (Amended Complaint, ¶¶ 4 and 40 (f)), and,

• Chesterfield ignored its own Cash Proffer Policy when it refused to give credit or even negotiate a possible credit for Viridis' public infrastructure work, as Chesterfield had

---

[14] *Rowe,* 216 S.E.2d at 209.

done in the 1996 zoning of the project (Amended Complaint, ¶¶ 4 and 40 (f) and (h)).

The simple fact that Chesterfield estimated the so-called public infrastructure impact of each residential dwelling to be constructed in the County, placed a $19,000.00 price tag on it, and then tried to impose development conditions of almost the same amount on Viridis as a condition for approving the rezoning application, should be proof enough of the lack of "rough proportion" and "nexus" between what Chesterfield demanded and what it was entitled to get.[15]

IV.    This Court Should Retain Supplemental Jurisdiction Over Count II

A.    Chesterfield's Motion to Dismiss Count II should be denied because it fails to address the substantive factual allegations and causes of action predicated on § 15.2-2298 as stated in Count II of the Amended Complaint

Count II of the Amended Complaint raises a supplemental state claim that Chesterfield's application of its Cash Proffer Policy to Viridis' request to amend the zoning of its Forest Ridge project exceeds the lawful authority granted to Chesterfield by the Virginia legislature in Virginia Code Section 15.2-2298 which states in pertinent part:

> In any such locality (as Chesterfield), . . . a zoning ordinance may include and provide for the voluntary proffering in writing, by an owner of **reasonable conditions**, prior to a public hearing before the governing body, in addition to the regulations provided for in the zoning district or zone by the ordinance as a part of a rezoning or amendment to a zoning map, **provided that the (i) rezoning itself gives rise to the need for the conditions; (i) the conditions have a reasonable relation to the rezoning;  and (iii) all conditions are in conformity with the comprehensive plan as defined in Section 15.2-2223.**

Va. Code Ann. § 15.2-2298 (emphasis added).

The Virginia Supreme Court has long prohibited local governments from requiring "private landowners, as a condition precedent to development, **to construct or maintain public facilities on land owned by the sovereign, when the need for such facilities is not**

---

[15] While it may not be possible to divine the true rationale behind Chesterfield's actions, one can reasonably surmise that it was a response to Viridis' asking to be relieved from the cash proffers.

**substantially generated by the proposed development**." *Rowe*, 216 S.E.2d at 209 (emphasis added).  It is clear, therefore, that Section 15.2-2298 grants local governments the authority to accept a private landowner's voluntary offer of property, construction or cash to be applied for public works that are to be owned by, maintained by and on land owned by the local government and which the local government would not otherwise be able to require or accept from a private developer.  But this authority to accept "voluntary proffers" is limited; even here the requested rezoning *itself* must give rise to the need addressed by the condition or proffer and the condition or proffer must still be reasonable.[16]

Count II of the Amended Complaint addresses the application of Chesterfield's proffer policy that is far broader than the basis on which Chesterfield argues for its dismissal. Specifically, Count II incorporates the prior factual allegations contained in the Amended Complaint and alleges that (i) Viridis' Forest Ridge rezoning project does not "itself give rise" to the school, library, parks or public safety, (ii) the Comprehensive Plan does not contemplate or plan for additional school, library parks or public safety facilities in the district where Forest Ridge is located, and (iii) Chesterfield's demand for cash and in-kind contributions based on Chesterfield's own analysis of the "impact" that Forest Ridge has on public infrastructure exceeds the authority granted by the legislature in Section 15.2-2298.  (Amended Complaint, ¶¶ 46 and 49.)  The allegation in Paragraph 46(i) of the Amended Complaint regarding the schools

---

[16] Even under this expansive conditional zoning authority there are certain types of public works that are not "proffer eligible."  For example, Chesterfield claims to be able to calculate the average number of public school students generated by each dwelling unit across the county.  It collects cash proffers "to fund the public facility needs generated by any new residential development," and it collects tax revenue to "pay all the normal operating costs for services to residents of new developments." (Amended Complaint, Ex. 1, ¶¶ (A)(4) and (5)).  As such, new classrooms to accommodate new students generated by the new development would be "proffer eligible," whereas new roofing on an existing gymnasium, for example, would not, because new students do not give rise to the need for roofing repairs.

is tied to the prior factual allegations that Chesterfield commits in its Cash Proffer Policy to spend school proffers within the school district where a development is located. (Exhibit 1, Cash Proffer Policy Paragraph (A)(6) and (B)(2)(b).) The allegation in Paragraph 46(ii) of the Amended Complaint is tied to the prior factual allegation that none of the public facilities for which Viridis' cash proffer is to be collected are in Chesterfield's Comprehensive Plan, for the district within which Viridis is located. Amended Complaint, § 46(ii). The allegation in Paragraph 46(ii) of the Amended Complaint, to the effect that Chesterfield's demand for maximum cash proffers plus additional public infrastructure works, is tied to the prior factual allegations in the Amended Complaint, ¶¶ 40 (e)-(h).

Chesterfield's Motion to Dismiss Count II of the Amended Complaint fails to address any of the factual allegations or legal arguments noted above and does not even suggest that taken together or individually these allegations fail to state a supplemental cause of action under the Dillon Rule to the effect that Chesterfield's cash proffer policy as-applied in this case exceeds the authority granted to it, by the Virginia legislature. Accordingly, Chesterfield's Motion to dismiss Count II of the Amended Complaint should be denied.

> B.      The Supremacy Clause of the United States Constitution preempts any attempt of a state legislature from divesting a federal court of its subject matter jurisdiction

Chesterfield's Motion related to Virginia Code Section 15.2-2208.1 (appearing at Legal Argument Section IV(B)) contends that the statute "*requires* that 'any action brought' pursuant to this section be filed in the local circuit court, which in this instance, would be the Circuit Court for Chesterfield County." (Chesterfield Memorandum, at 25 (emphasis in original).) This

argument ignores the Court's supplemental jurisdiction to hear associated state claims, where subject matter jurisdiction is founded on federal questions.

Furthermore, it necessarily assumes that the Virginia General Assembly has the authority to divest a federal district court of its constitutionally granted subject matter jurisdiction. This argument conflicts with the Supremacy Clause (U.S. Const. Article VI, Clause 2) and resembles the type of "states rights/nullification" argument resolved close to two centuries ago. *See Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304 (1816)*, Cohens v. Virginia,* 10 U.S. (6 Wheat.) 264 (1821)*, Cooper v. Aaron,* 358 U.S. 1 (1958). It is more appropriately viewed as a venue requirement.

    C.    It would be an abuse of discretion for this court to dismiss Counts I or II or Viridis' claim under Virginia Code Section 15.2-2208.1

All counts in the Amended Complaint are well pled, and Defendants' attack under Rule 12(b)(6) is unavailing. Moreover, abstention under *Burford* is not justified. Even if abstention under *Burford* were warranted, dismissal is not the appropriate remedy because damages are requested. *Quackenbush v. Allstate Insurance Co*., 517 U.S. 706 (1996).

The Defendants have failed to show why this Court should not retain Count I and exercise its supplemental jurisdiction to retain Count II. If, however, the federal claims are dismissed without prejudice, Viridis does not object to the Court's (i) refusing to exercise supplemental jurisdiction over the state law claims pled in Count II and (ii) dismissing the claims alleged in Count II without prejudice.

**CONCLUSION**

For the foregoing reasons, Viridis respectfully requests this Court to deny Defendants' Motions to Dismiss.

Dated:  October 14, 2014                    VIRIDIS DEVELOPMENT CORPORATION,


                                            By  /s/   Robert R. Gordon

Robert R. Gordon, Esquire (VSB #18711)
Bruce E. Arkema, Esquire (VSB #18625)
Barrett E. Pope, Esquire (VSB #20574)
Debbie G. Seidel, Esquire (VBB #23124)
DURRETTECRUMP PLC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone:  (804) 775-6900
Facsimile:   (804) 775-6911
rgordon@durrettecrump.com
barkema@durrettecrump.com
bpope@durrettecrump.com
dseidel@durrettecrump.com

*Counsel for Plaintiff*


### CERTIFICATE OF SERVICE

        I hereby certify that on the 14th day of October, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

        Jeffrey L. Mincks, Esquire (VSB No. 18317)
        Chesterfield County Attorney
        P.O. Box 40
        Chesterfield, VA 23832-0040
        Telephone:  (804) 748-1491
        Facsimile:   (804) 717-6297
        countyattorney@chesterfield.gov

        *Counsel for Defendants*

                              /s/    Robert R. Gordon
                            Robert R. Gordon, Esquire (VSB #18711)
                            DURRETTECRUMP PLC
                            1111 East Main Street, 16th Floor
                            Richmond, Virginia  23219
                            Telephone:  (804) 775-6900
                            Facsimile:   (804) 775-6911
                            rgordon@durrettecrump.com